334 A.2d 268
COMMONWEALTH of Pennsylvania
v.
Marilyn Ann DOBROLENSKI, Appellant.

COMMONWEALTH of Pennsylvania, Appellant,
v.
Marilyn Ann DOBROLENSKI.

Supreme Court of Pennsylvania.
Argued Nov. 12, 1974.
Decided March 18, 1975.

632

John S. J. Brooks, Media, for appellant in No. 493 and appellee in No. 495.

Stephen J. McEwen, Jr., Dist. Atty., Ralph B. D'Iorio, Asst. Dist. Atty., Chief, Appeals Div., John A. Reilly, Chief Deputy Dist. Atty., Media, for appellee.

**634**

Before JONES, C. J., and EAGEN, O'BRIEN, ROB-
ERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellant Marilyn Dobrolenski was charged with two
counts of murder in connection with the deaths of Ron-
ald Carey and David Yarrington. As to each count, she
pleaded guilty to murder generally and, after a degree of
guilt hearing, was convicted of murder in the first de-
gree. Sentence was initially fixed at death, but the trial
court vacated this sentence in light of *Furman v. Geor-
gia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972),
and imposed two consecutive life sentences. These direct
appeals followed.[1]

Dobrolenski contends that (1) her plea of guilty was
coerced by the trial court's allegedly erroneous refusal to
grant a change of venue, and (2) an erroneous ruling by
the court at the hearing on her motion to suppress cer-
tain inculpatory statements prevented her from estab-
lishing a denial of her right to counsel during police in-
terrogation. The Commonwealth challenges the order
vacating the sentence of death. We affirm.

 In addition to reviewing the errors assigned by
the parties, we are under a statutory duty, Act of Febru-
ary 15, 1870, P.L. 15, § 2, 19 P.S. § 1187 (1964), to de-
termine whether the evidence is sufficient to support the
conclusion that the crime rose to murder in the first de-
gree. In reviewing the sufficiency of the evidence, we
must, of course, view the record in the light most favor-
able to the verdict winner, in this case the Common-
wealth. *Commonwealth v. McFadden*, 448 Pa. 277, 281,
292 A.2d 324, 326 (1972). So viewed, the record disclos-
es that on January 5, 1972, Irving Hogg and Dobrolenski

1. Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970,
 P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1974).

perpetrated an armed robbery of a motel. As they left the motel they encountered police officers Carey and Yarrington, who sought to apprehend them. The police officers engaged in a struggle with Hogg and, while they were struggling, Dobrolenski pointed a gun at the officers and fired several shots, which fatally wounded the officers. This evidence is sufficient to support a finding of murder in the first degree either as a felony murder or a willful, deliberate, and premeditated killing. See Act of June 24, 1939, P.L. 872, repealed by Act of December 6, 1972, P.L. 1482, No. 334, § 5.

Dobrolenski's principal argument relates to the denial of her motion for change of venue. The crimes were committed on January 5, 1972, and Dobrolenski was arrested and arraigned on January 6. On February 10, a motion for change of venue was filed, alleging that "the incident, the alleged perpetrators, the victims and their families have been the subject of intensive and extensive publicity by all the mass media" to a degree unprecedented in the history of Delaware County. It was contended that, because of this publicity, it would be impossible to impanel an impartial jury. On February 25, a hearing was held and the motion was denied.

In March the grand jury returned indictments for murder against Dobrolenski. The case was then continued to the June term of court to permit psychiatric examination. A motion to suppress evidence was filed on June 10 and denied on June 16, after a hearing. On June 19, Dobrolenski entered counseled pleas of guilty to murder, generally, which she now contends were coerced by the allegedly erroneous denial of a change of venue.

At the outset we are met with a contention by the Commonwealth that review of the denial of change of venue is foreclosed by Dobrolenski's failure to attempt the impaneling of an impartial jury. The Commonwealth relies primarily on the case of *Butzman v. United States*, 205 F.2d 343 (6th Cir. 1953), where a waiver of

jury trial was held to preclude challenge to the prior failure to grant a change of venue. After noting its belief that a fair jury might have been impanelled, the court of appeals stated:

> "The way to have preserved the alleged error was to have proceeded with a trial by jury under protest and let the record show whether the jury as so impanelled provided the appellant with the fair and impartial trial to which he was entitled. In electing to pursue the course which he took, appellant was attempting to obtain whatever advantage might result from the trial without a jury, and if unsuccessful still maintain that the result was not binding upon him. Under such circumstances, the election is clearly binding upon the appellant."

Id. at 350 (citations omitted).

While the *Butzman* view is not entirely without merit, it is based on the premise that consideration of the record of the *voir dire* is essential to review of a denial of change of venue. Specifically, it assumes that to obtain relief, a defendant must show by the *voir dire* that a fair and impartial jury could not have been obtained. See id. We conclude that the sounder view is that expressed by the ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.2 (Approved Draft, 1968), which provides in pertinent part:

> "(d) . . . If . . . review of a prior denial [of change of venue] is sought, after the jury has been selected, the fact that a jury satisfying prevailing standards of acceptability has been selected shall not be controlling if the record shows that the criterion for the granting of [change of venue] . . . has been met.

> "(e) . . . The claim that the venue should have been changed . . . shall not be considered

waived by the waiver of the right to trial by jury or by the failure to exercise all peremptory challenges."

The strong reasons supporting the proposed standard are succinctly stated:

"It has mány jurisdictions been common practice for denial of [a motion for change of venue] to be sustained if a jury meeting prevailing standards could be obtained. There are two principal difficulties with this approach. First, many existing standards of acceptability tolerate considerable knowledge of the case and even an opinion on the merits on the part of the prospective juror. And even under a more restrictive standard, there will remain the problem of obtaining accurate answers on *voir dire*—is the juror consciously or subconsciously harboring prejudice against the accused resulting from widespread news coverage in the community? Thus if the change of venue . . . [is] to be of value, [it] should not turn on the results of *voir dire; rather [it] should constitute [an] independent [remedy] designed to assure fair trial when news coverage has raised substantial doubts about the effectiveness of the voir dire standing alone.*

"The second difficulty is that when disposition of a motion for change of venue . . . turns on the results of the *voir dire,* defense counsel may be placed in an extremely difficult position. Knowing conditions in the community, he may be more inclined to accept a particular juror, even one who has expressed an opinion, than to take his chances with other less desirable jurors who may be waiting in the wings. And yet to make a record for appellate review, he must object as much as possible and use up his peremptory challenges as well. This dilemma seems both unnecessary and undesirable.

. . . . . . . .

"[Subsection (e)] provides that the right to a . . . transfer shall not be deemed to have been

638

waived by waiver of a jury or by failure to exhaust all peremptory challenges. The suggestion of some courts that such conduct amounts to a waiver [citing, inter alia, *Butzman*] seems to require the defendant to take unnecessary risks. If the defendant has satisfied the criterion for granting of relief, *it should not matter that he has subsequently waived a jury, perhaps out of fear that even a jury meeting accepted standards will not be truly free from bias* or has failed to use his peremptory challenges, perhaps because he prefers the ills he has to others he has not yet seen."

Id., Comments, at 126–28 (emphasis added, footnotes omitted).

We believe that these considerations are applicable here and, therefore, that Dobrolenski did not foreclose review by her waiver of a jury trial. We need not determine the precise standard for permitting withdrawal of a guilty plea motivated by an improper failure to grant a change of venue, cf. *Commonwealth v. Taylor*, 449 Pa. 345, 347, 296 A.2d 823, 824 (1972) (plea motivated by unconstitutionally obtained confession); id. at 351–52, 296 A.2d at 826 (dissenting opinion), for we conclude that Dobrolenski has not established that the denial of the change of venue was improper.

 While the record of the proceedings on the motion for change of venue is not entirely clear, it appears that the only evidence before the court was a collection of newspaper articles which had been published from January 6 to January 15.[2] These contain some information, most notably reports that Dobrolenski had orally confessed and statements that the incident in which the officers were killed was the last in a series of armed robberies committed by Hogg and Dobrolenski, which would

2. While the trial court was probably familiar with the approximate impact of the newspapers involved in Delaware County, appellate review is hampered by the absence of evidence on this point in the record.

tend to create prejudice in potential jurors who read them. See *Commonwealth v. Pierce*, 451 Pa. 190, 200, 303 A.2d 209, cert. denied, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973); see generally ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press §§ 1.1, 2.1 (Approved Draft, 1968). However, at the time of the motion for change of venue, indictments had not yet been returned and the time of trial, if any, was thus uncertain. Moreover, when the motion was heard, the most recent of the allegedly prejudicial articles was six weeks old. The court might properly have concluded that, absent further prejudicial publicity, the effect of the news coverage complained of could sufficiently dissipate by the probable time of trial (especially in view of the possibility of continuances for the purpose of dissipating that effect). See *Commonwealth v. Powell*, 459 Pa. 253, ——, 328 A.2d 507, 511 (1974). The trial was about to begin more than five months after the last of the articles in question was published when it was aborted by Dobrolenski's plea of guilty. The motion for change of venue was never renewed and no attempt was made to secure a further continuance of the trial. In these circumstances, we cannot say that it was error to deny the motion for change of venue made in February. Any claim based on evidence not presented at the hearing or on later events was waived by failure to present it to the trial court.

Because there was no erroneous denial of a change of venue, Dobrolenski cannot complain that her plea of guilty was "coerced" by it. Her attack on the validity of her plea must therefore fail.

Dobrolenski's second assignment of error relates to the hearing on her motion to suppress certain oral statements she made to police officers. At that hearing, her counsel wished to call her to testify solely about alleged abridgement of her rights to counsel. Counsel sought an advance ruling that cross-examination would not be per-

mitted on any other subject. When the suppression court ruled that she might also be cross-examined in the usual fashion with regard to her credibility, Dobrolenski declined to take the stand.

Dobrolenski now contends that this ruling improperly compelled her to choose between vindication of her claimed deprivation of the right to counsel and assertion of her privilege against self-incrimination.[3] Dobrolenski offers no authority for this contention and we conclude that it is without merit.

To begin with, the privilege against self-incrimination does not entirely shield a criminal defendant from cross-examination. In the words of Justice Frankfurter, writing for the United States Supreme Court in *Brown v. United States*, 356 U.S. 148, 154–55, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958) :

"If he takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. '[H]e has no right to set forth to the [trier of fact] all the facts which tend in his favor without laying himself open to cross-examination upon those facts.' "

The most recent statement of the scope of cross-examination by this Court was in *Commonwealth v.*

---

**3.** In the plea colloquy, Dobrolenski specifically stated that her plea of guilty was *not* primarily motivated by the refusal to suppress her statement. Consequently, even an improper failure to suppress would not affect the validity of her plea, either under the prevailing view in this Court, see *Commonwealth v. Taylor*, 449 Pa. 345, 347, 296 A.2d 823, 824 (1972), or that of the minority on this issue, see id. at 351–52, 296 A.2d at 826 (dissenting opinion of Nix, J., joined by Roberts and Manderino, JJ.). However, because the statements were received in evidence at the hearing on the degree of guilt, it remains necessary to determine their admissability. *Commonwealth v. Marsh*, 440 Pa. 590, 594, 271 A.2d 481, 483–84 (1970). Thus the claim of error at the suppression hearing, having been properly preserved at all stages of the proceedings, is properly before us.

*Lopinson*, 427 Pa. 284, 300, 234 A.2d 552, 562 (1967), vacated on other grounds, 392 U.S. 647, 88 S.Ct. 2277, 20 L.Ed.2d 1344 (1968), where Mr. Justice Eagen wrote for the Court:

> "Full cross-examination of a witness upon the substance of his direct testimony is an absolute right . . .. [citations omitted]. Moreover, the right of cross-examination extends beyond the subjects testified to in direct testimony and includes the right to examine on any facts tending to refute 'inferences or deductions' arising from matters testified to on direct."

Cross-examination may also extend to matters tending to show bias or otherwise affect the credibility of the witness. See *Commonwealth v. Cheatham*, 429 Pa. 198, 202–04, 239 A.2d 293, 296 (1968).

▮▮▮▮▮ As nearly as we can determine, the claim of infringement on Dobrolenski's privilege against self-incrimination caused by cross-examination relates not to the suppression hearing itself but rather to possible use at trial of the matter elicited. However, Rule 323 of the Pennsylvania Rules of Criminal Procedure, 19 P.S. Appendix, provides, in pertinent part:

> "(g) . . . The clerk of court shall impound the record [of the suppression hearing] . . .. The record shall remain thus impounded unless the interests of justice require its disclosure.

> "(h) . . . The defendant may testify at such hearing, and, if he does so, he does not thereby waive his right to remain silent during trial."

These provisions are designed to obviate any need to choose between testifying in support of a motion to suppress and remaining silent at trial. The suppression court specifically directed the attention of both Dobrolenski and her counsel to these provisions of Rule 323 and noted their protective purpose. Any fear that the testimony elicited at the suppression hearing might be uti-

lized at trial was, therefore, clearly groundless. Consequently, the refusal to abnormally restrict the scope of potential cross-examination before the direct examination had even begun was not error.

The foregoing suffices to dispose of Dobrolenski's appeal. There remains the Commonwealth's appeal from the order vacating the death sentence originally imposed. The Commonwealth's principal contention is that the application of the death penalty in Pennsylvania has not been arbitrary, capricious, or discriminatory. It argues that this history saves the statute in effect at the time of these murders [4] from the ban of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).[5]

We have repeatedly held that *Furman* precludes imposition of the death penalty under the statute in question. *Commonwealth v. Scoggins,* 451 Pa. 472, 481, 304 A.2d 102, 108 (1973); *Commonwealth v. Ross,* 449 Pa. 103, 105, 296 A.2d 629, 630 (1972); *Commonwealth v. Lopinson,* 449 Pa. 33, 34, 296 A.2d 524, 525 (1972); *Commonwealth v. Sharpe,* 449 Pa. 35, 44, 296 A.2d 519, 524 (1972); *Commonwealth v. Bradley,* 449 Pa. 19, 23–24,

4. Act of June 24, 1939, P.L. 872, repealed by Act of December 6, 1972, P.L. 1482, No. 334, § 5. This case does not involve the constitutionality of the imposition of the death penalty under the statutes currently in force, Act of March 26, 1974, P.L. ——, No. 46, amending 18 Pa.C.S. §§ 1102, 2502 (1973).

5. The Commonwealth also contends that the pre-*Furman* statute is saved from the strictures of *Furman* by the existence of "standards applicable . . . to determine whether the penalty in a first degree murder should be life [imprisonment] or death." This contention refers not to the sort of legislatively mandated standards now prescribed by 18 Pa.C.S. § 1311(d) but simply to an indefinite, non-exclusive, and non-binding list of factors such as "the nature of the crime," "the defendant's physical condition, mental capacity, his past history, his age, discretion, and *anything else [the jury considers] important as having a bearing on the punishment to be inflicted.*" (emphasis added). This argument need not long detain us, for such "standards" were applicable in the same informal fashion under all the statutes before the United States Supreme Court in *Furman* and were necessarily rejected as a ground for sustaining those statutes. Thus *Furman* forecloses this argument.

295 A.2d 842, 845 (1972); cf. *Commonwealth v. Senk,* 449 Pa. 626, 296 A.2d 526 (1972). The Commonwealth recognizes this but offers an evidentiary record, not present in those cases, purporting to show that there has been no discrimination in the imposition of the death penalty on the basis of race, wealth, or nature of the proceeding leading to conviction (jury trials vs. pleas of guilty). However, as we recognized in the above cases, *Furman* holds that "the imposition of the death penalty *under statutes, such as here involved,* is violative of the Eighth and Fourteenth Amendments." *Commonwealth v. Scoggins,* supra, 451 Pa. at 481, 304 A.2d at 108 (emphasis added). Had we viewed evidence of the actual application of the statute as necessary for determination of its constitutionality, we would have directed evidentiary hearings in those cases. As we understand *Furman,* the constitutional prohibition extends at least to all death sentences imposed pursuant to statutes which give the sentencing authority unfettered discretion in imposition of the death penalty. Because this *statute* gives such discretion, the constitution forbids the execution of any death sentences imposed under its authority.

Judgment of sentence affirmed.

EAGEN, J., concurs in the result.